23-mj-1167-DLC

## AFFIDAVIT IN SUPPORT OF A COMPLAINT

I, Kristen Feldmann, Special Agent, Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the FBI, duly appointed according to law and acting as such. I have been employed as an FBI Special Agent since 2021. I am currently assigned to the Public Corruption and Civil Rights squad in the Boston Division, where I investigate public corruption and civil rights offenses, including hate crimes. I am a graduate of the FBI Academy in Quantico, Virginia, and I have received on-the-job training and attended courses sponsored by the FBI and the Department of Justice on how to conduct investigations of violations of various federal laws. During my career, I have been involved in many complex investigations. As part of those cases, I have interviewed defendants, witnesses, and victims; conducted surveillance; worked with confidential informants; and participated in investigations using court-authorized interception of wire and electronic communications. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C).

2. The statements in this affidavit are based on my personal knowledge, information I have received from witnesses or other law enforcement personnel, and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing the requested arrest warrant, I have not included every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause for the requested warrant.

3. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that Robert A. Kennedy ("KENNEDY") committed violations of 18 U.S.C. § 1343 (wire fraud).

4. KENNEDY, a former detective sergeant in the Stoneham Police Department, is a serial debt fraudster who has a trail of bad debts, collections, and unpaid judgments. KENNEDY defrauded his last three landlords by providing materially false and misleading information in his rental applications to obtain the respective apartment leases. After moving in, KENNEDY would intentionally withhold rent payments, despite making $141,000 - $187,000 a year from the Stoneham Police Department. KENNEDY lived in the apartments rent-free by taking advantage of the slow eviction process—which was further delayed because KENNEDY's girlfriend filed fraudulent applications for housing assistance.

5. KENNEDY defrauded his most recent landlord ("Landlord") by submitting materially false and fraudulent information during the rental application process. The Landlord required KENNEDY to submit to a tenant screening service, which included a credit check and eviction history check. Instead of providing his own date of birth and social security number to the tenant screening service—which likely would have shown KENNEDY's history of collections, delinquent payments, defaults, and evictions—KENNEDY provided the date of birth and social security number of a relative who shared his first and last name. The Landlord relied on the information from the fraudulently obtained tenant screening report to approve KENNEDY's rental application and give KENNEDY a lease for the apartment. KENNEDY immediately and intentionally violated the terms of the lease by giving the Landlord bad checks for his rent and security deposit and failed to make subsequent rent payments. KENNEDY lived

in the apartment for approximately four months without making rent payments and currently owes the Landlord approximately $14,000 in overdue rent.

## FACTS SUPPORTING PROBABLE CAUSE

6. KENNEDY was an officer of the Stoneham Police Department starting in or about January 2001 and achieved the rank of Detective Sergeant. KENNEDY received weekly paychecks from the Stoneham Police Department including his base salary, seniority pay, overtime pay, and payment for details. In total, KENNEDY received more than $186,000 in 2019; $187,000 in 2020; $173,000 in 2021; and $141,000 in 2022 from the Stoneham Police Department. Kennedy retired from the Stoneham Police Department on or about February 23, 2023.

### Judgments and Credit History

7. KENNEDY has a history of evading financial responsibilities and failing to make payments due to creditors. KENNEDY has been the subject of at least six small claims actions filed from 2002 through 2021, including:

   a. A small claims complaint filed on or about August 19, 2002, by a private company. The claim was dismissed on or about October 21, 2002, after all parties failed to appear for a trial. The complaint was refiled on or about January 27, 2003 and settled out of court on or about March 7, 2003.

   b. A small claims complaint filed by a private company on or about March 14, 2006, which resulted in a judgment for $4,605.

   c. A complaint by a landlord filed on or about November 24, 2008, which resulted in a judgment for $5,751.89 and an execution of writ of possession for 84 Pearl Street, Woburn, MA.

      d.      A small claims complaint filed by a credit card company on or about January 13, 2010, which resulted in a $1,282.92 judgment entered on March 3, 2010. On or about October 14, 2011, a capias warrant (a warrant to arrest a debtor to secure their appearance in court) was issued to KENNEDY for the judgment, and the judgment was satisfied by on or about March 29, 2012.

      e.      A small claims complaint filed on or about June 10, 2021, for $229.90 filed by a fuel company for fuel delivered to KENNEDY's previous residence at 10 Essex Street. The complaint stated, "[KENNEDY] acknowledged receiving our messages and said he was sending a check, but never did, after several efforts (6)." The complaint was dismissed on or about March 25, 2022 after both parties failed to appear for a hearing.

      f.      A small claims complaint filed by KENNEDY's spouse on or about August 10, 2021, which stated, "On June 1, 2021, the defendant borrowed money in the amount of $1,500.00. He has defaulted on his promise to repay the debt." A judgment for $1,678.80 was entered in favor of KENNEDY's spouse on April 28, 2022.

8.      KENNEDY's credit report shows four separate collection proceedings with a total of $29,941 in past due payments. The credit report also shows a history of frequent late payments and five other credit accounts with a total of over $10,900 in past due balances.

### KENNEDY's History of Foreclosure and Evictions

9.      Before KENNEDY defrauded the Landlord, KENNEDY engaged in a pattern of evading mortgage and rent payments, sometimes using lies and deception to obtain and maintain his housing without making payments.

*10 Essex Street*

10. On or about August 17, 2012, KENNEDY and his spouse (the "Spouse") purchased a house at 10 Essex Street, Stoneham, MA for approximately $340,000 and obtained a $272,000 mortgage from Bank A for the property. Under the mortgage loan agreement, KENNEDY owed Bank A approximately $1,812 in monthly payments.

11. KENNEDY failed to make the required mortgage payments, and by December 2015 KENNEDY's total debt to Bank A had grown to approximately $287,090. Bank A, however, was barred from initiating foreclosure proceedings because KENNEDY filed for bankruptcy under Chapter 13 of the United States Bankruptcy Code on or about August 20, 2015.

12. The U.S. Bankruptcy Court established a 60-month plan for KENNEDY to pay back Bank A and other creditors. Under the plan, KENNEDY agreed to (i) pay approximately $356 per month, which would be transmitted to Bank A and other creditors and (ii) continue his regular mortgage payments to Bank A.

13. On or about May 9, 2019, Bank A reported to the U.S. Bankruptcy Court that KENNEDY had missed eighteen payments under the Court's plan and moved for the right to foreclose on 10 Essex Street. KENNEDY's debt to Bank A had grown to approximately $291,929.25.

14. KENNEDY voluntarily dismissed his bankruptcy case and the Massachusetts Land Court executed an Order of Notice to Foreclose on the 10 Essex Street property on or about July 5, 2019.

15. The foreclosure proceedings were halted again after the Spouse filed for bankruptcy under Chapter 13 of the United States Bankruptcy Code on or about August 16, 2019. The Spouse's bankruptcy case was dismissed on July 16, 2020.

16. KENNEDY's mortgage payments to Bank A are still overdue. According to a letter from Bank A's collection agency, dated August 16, 2022, KENNEDY owed the bank $343,562, which included $25,898 in overdue payments. In contrast, KENNEDY's gross paychecks from the Stoneham Police Department ranged from approximately $144,000 to $187,000 from 2015 through 2020.

*Mave Apartments*

17. On or about February 6, 2020, KENNEDY and his girlfriend (the "Girlfriend") submitted a rental application for a two-bedroom apartment at the Mave Apartments ("Mave Apartments"), a luxury apartment complex in Stoneham, MA, with a monthly rent of $3,020.

18. In the rental application KENNEDY falsely stated that he had not been the subject of "[a]ny evictions, suits, judgements [sic], bankruptcies, foreclosures, etc." KENNEDY also stated that his current employer was the Stoneham Police Department, and his monthly income was $7,000.

19. Mave Apartments' tenant screening report flagged KENNEDY's previous Chapter 13 bankruptcy filing and recommended rejecting the rental application. Management at Mave Apartments, however, overrode the tenant screening warning, accepted KENNEDY's application, and offered KENNEDY and the Girlfriend a one-year lease for a two-bedroom apartment.

20. KENNEDY and the Girlfriend executed the lease with Mave Apartments on or about February 27, 2020 under which they agreed to pay the monthly rent of $3,020 plus additional fees for water, sewer, gas, and electric service.

21. KENNEDY and the Girlfriend quickly began withholding rent payments, failing to make online payments or submit checks when their rent was due. By October 2020,

KENNEDY owed $13,231 in overdue payments and Mave Apartments issued a 30-day notice to quit the premises for non-payment of rent.

22.     Mave Apartments filed an eviction action against KENNEDY and the Girlfriend on or about December 14, 2020.  Eviction proceedings, however, were halted after the Girlfriend applied for rental assistance through the Residential Assistance for Families in Transition (RAFT) program on or about January 21, 2021.

23.     Under Chapter 257 of the Acts of 2020, a Housing Court must grant a continuance of eviction if (i) the defendant demonstrates a pending RAFT application, (ii) the tenancy is being terminated solely for non-payment of rent; and (iii) the non-payment of rent was due to a financial hardship related to or exacerbated by the COVID-19 emergency.

24.     The RAFT Program is a homelessness prevention program funded by the Massachusetts Department of Housing and Community Development ("DHCD"), which provides up to $10,000 within a 12-month period in short-term financial assistance to low-income families.  In most cases, to qualify for RAFT, the applicant's household income must be below 50% of the Area Median Income.  The income limit for RAFT applicants was approximately $56,100 for a two-person household, $63,100 for a three-person household, and $70,100 for a four-person household.  RAFT applicants must list every member of a household and upload photo identification for the Head of Household.

25.     The Girlfriend concealed KENNEDY and his income from the DHCD by omitting KENNEDY in her RAFT application.  Instead, the Girlfriend's RAFT application listed herself as the Head of Household and her three minor children as members of the household. The Girlfriend did not list KENNEDY as a member of the household or reference him anywhere in the application.  The RAFT Application even asked, "Are you sure you have entered all

household members into this application?" To which the Girlfriend responded, "Yes." The Girlfriend also checked a box on the application stating, "I certify that the above income is true, accurate and complete. I recognize that incorrect statements about my household income may result in application delays or denial."

26. The Girlfriend's RAFT application disclosed her annual income of approximately $14,160 from Massachusetts Unemployment Insurance payments. The Girlfriend did not disclose KENNEDY's gross income of approximately $187,000 in 2020, which would have disqualified the RAFT application.

27. On or about March 19, 2021, the Massachusetts Department of Housing and Community Development approved the Girlfriend's RAFT application and paid Mave Apartments $10,000, which was applied to KENNEDY's and the Girlfriend's overdue rent and utilities.

28. Even after the RAFT payment, KENNEDY still owed Mave Apartments more than $14,000 in back rent, and KENNEDY continued to withhold ongoing rent payments while still residing in the apartment despite having the means to do so.

29. KENNEDY gave various explanations for his failure to pay rent. At a Housing Court hearing on or about July 13, 2021, KENNEDY testified that he was stricken with COVID-19 and the pandemic reduced the number of overtime hours available to him. In reality, KENNEDY received over $23,000 in detail payments and $8,000 in overtime pay in January through July 2021 from the Stoneham Police Department. His total income from Stoneham Police Department for 2021 was approximately $173,512—which was only slightly lower than the approximately $187,384 in income he received in 2020.

30. On or about July 19, 2021, the Housing Court granted Mave Apartments an order of eviction, which could be executed on or after August 16, 2021, and a $24,398 judgment against KENNEDY. KENNEDY and the Girlfriend vacated the apartment at Mave Apartments on or about October 5, 2021.

***Reading Commons***

31. On or about October 5, 2021, KENNEDY and the Girlfriend applied to rent a two-bedroom apartment at Reading Commons Apartments in Reading, Massachusetts with a monthly rent of $3,087.

32. KENNEDY's application contained several materially false and misleading statements including:

    a. To the question, "Have you ever been evicted?" KENNEDY responded, "No." KENNEDY did not disclose his recent eviction from Mave Apartments or his eviction from 84 Pearl Street in 2008.

    b. KENNEDY listed his address as "10 Essex St., Stoneham, MA" and stated that it was his residence from "1/10/2011." KENNEDY's application did not mention his previous address at Mave Apartments.

    c. KENNEDY stated his "Reason for Moving" was "Selling home." KENNEDY's application did not disclose that he was leaving his previous residence at Mave Apartments because he was evicted for failing to pay rent.

33. On or about October 7, 2021, Reading Common notified KENNEDY that his rental application was rejected because of his bankruptcy history and poor credit history. KENNEDY wrote to the assistant property manager at Reading Commons the same day:

> I wanted to take a moment and explain our situation. My credit has taken a hit because I was a victim of identity theft from a family member. I continue to work with the credit agencies to correct many false obligations on my credit report. In

addition I make more than enough money to afford the apartment. I hope your company reconsiders this decision. Please call me at XXX-XXX-7888 if you'd like to discuss further.

(In response to requests for records related to KENNEDY, Transunion and Experian did not disclose any substantiated reports of identity theft.)

34.   The assistant property manager at Reading Commons responded:

If you are able to provide us with the documentation that the identity theft was reported to authorities, we can submit it to our corporate help desk for further review. Another option would be trying to [add] on a guarantor to see if their screening is able to qualify your application.

35.   KENNEDY subsequently used a family member ("Family Member 1") as a guarantor for the Reading Commons rental application.

36.   KENNEDY, the Girlfriend, and Family Member 1 executed a one-year a lease for a two-bedroom apartment at Reading Commons, with KENNEDY and the Girlfriend moving into the apartment on or about October 15, 2021.  Although Family Member 1 was listed on the rental application and lease, Family Member 1 did not reside at the Reading Commons apartment.

37.   Despite claiming to "make more than enough money to afford the apartment," KENNEDY immediately began withholding rent payments to Reading Commons as well. KENNEDY's checks for the first month's pro-rated rent ($1,225) and his security deposit ($3,087) bounced for insufficient funds.  The checks were both dated October 15, 2021, and at that time KENNEDY's account balance for this bank account was $1,248.  When the checks were deposited on or about October 18, 2021, KENNEDY's account balance for this bank account fell to -$4,695.  Reading Commons served KENNEDY a notice to quit for non-payment of rent on or about October 25, 2021.  Although KENNEDY made one payment for $1,226 on or about October 25, 2021, he failed to make any additional rent payments for the next 12

months despite having the funds to do so. While living at Reading Commons KENNEDY received weekly paychecks from the Stoneham Police Departments totaling approximately $187,000 in 2020 and approximately $173,000 in 2021.

38. Reading Commons filed an eviction action for non-payment of rent in Housing Court on or about December 13, 2021. Reading Commons served KENNEDY a separate notice to quit and filed an additional eviction action for failing to disclose his previous eviction on his rental application on or about April 4, 2022.

39. KENNEDY, again, delayed eviction proceedings, pursuant to Chapter 257 of the Acts of 2020, by aiding and abetting the submission of materially false and misleading RAFT applications that misrepresented his household and income.

    a. On or about April 21, 2022, the Girlfriend submitted a RAFT application that, again, did not list KENNEDY as a member of the household and listed her annual income as $31,200.

    b. On or about August 18, 2022, the Girlfriend submitted another RAFT application, in which she listed KENNEDY as a member of the household but falsely stated his annual income was $52,000.

40. KENNEDY cited the RAFT applications in motions and at hearings before the Housing Court and Appeals Court in an effort to delay the eviction proceedings. KENNEDY also made false statements at various hearings:

    a. During a Housing Court hearing on or about June 2, 2022, KENNEDY stated that in his life experience, this was the only time he has been involved in an eviction. In reality, KENNEDY had been evicted from Mave Apartments less than 9 months earlier and evicted from 84 Pearl Street in 2008.

  b. During an Appeals Court hearing on or about August 18, 2022, KENNEDY stated, "We are overwhelmed right now, your honor, I am currently not working right now because of my medical event that happened [on July 12, 2022]. I'm not making any overtime, no details." When the Court asked if he was receiving "some kind of sick pay or sick leave, even if you're not getting any overtime," KENNEDY replied, "Yes, I had to fill out some paperwork with my folks at Stoneham PD, and I'm waiting for approval on that, and I should start receiving my sick pay." In reality, KENNEDY received his weekly salary of approximately $1,970 throughout his sick leave in July and August of 2022—there was no lapse in his salary payments from the Stoneham Police Department.

41. The Girlfriend's RAFT applications were denied on or about September 21, 2022. KENNEDY and the Girlfriend vacated the apartment on or about October 4, 2022. In total, they owed Reading Commons approximately $42,362 including back rent, utilities, late fees, legal fees, and fees for replacing the damaged carpet in the unit.

## Wire Fraud Involving the Chestnut Street Apartment

42. The Landlord owned a two-bedroom apartment in a multi-family building on Chestnut Street in Stoneham, MA (the "Chestnut Street Apartment") since in or around 2016. The Landlord began renting the Chestnut Street Apartment in or around 2018. The Landlord listed the Chestnut Street Apartment for rent again in or around October 2022 for approximately $2,550 per month. The Landlord received several applications for the apartment and rejected several applicants before meeting KENNEDY, including one applicant because of the applicant's poor credit history.

43. On or about October 18, 2022, the Girlfriend contacted the Landlord by phone and text message and asked for a tour of the Chestnut Street Apartment. The Landlord's spouse

showed the Chestnut Street Apartment to KENNEDY and the Girlfriend a few days later.  At the showing, KENNEDY introduced himself as a detective sergeant with the Stoneham Police Department and gave the Landlord's spouse his business card with his Stoneham Police Department address, phone number, and email address.

44. KENNEDY submitted a rental application for the Chestnut Street Apartment by emailing it from his email account, XXXXXXXXXXX@yahoo.com, to the Landlord's email account, XXXXXXX@gmail.com, on or about October 21, 2022.  KENNEDY's application contained several materially false and misleading statements and omissions, including:

    a. KENNEDY omitted the fact that he had been evicted from rental housing in response to the application's specific request asking KENNEDY if he had ever been evicted from rental housing.[1]

    b. KENNEDY stated that his current address was 10 Essex St., Stoneham, MA and that he had been living at that address for 12 years.  KENNEDY stated he was moving from 10 Essex St. because he was selling the home.

KENNEDY also provided the Landlord paystubs showing his salary, overtime, and detail payments from the Stoneham Police Department.

45. In addition to the rental application, the Landlord required applicants to submit to a credit check performed by an online, third-party tenant screening service.  The tenant screening service sent rental applicants a secure link where they registered their contact information, provided their personal information, including date of birth and social security number, and

---

[1] Specifically, in response to the question: "Have you ever been evicted from rental housing?" KENNEDY wrote a dash, "------" to create the impression that he had not, in fact, been evicted in the past.

answered a series of multiple-choice questions to verify their identity.  After the applicant provided their identifying information, the third-party tenant screening service sent the landlord an email notifying them that the tenant's credit report, eviction history report, and criminal history report was available for viewing on the third-party tenant screening service's website.  The report given to the landlord did not contain the applicant's sensitive personal information such as their social security number, date of birth, or any account numbers.

46. KENNEDY delayed providing information to the tenant screening service, even though the Landlord and the Landlord's spouse emailed KENNEDY asking for the credit report on October 24, October 26, October 31, and November 1, 2022.

47. On or about November 2, 2022, KENNEDY completed the online questionnaire sent by the tenant screening service, but instead of submitting his *own* information, KENNEDY submitted the name, date of birth, and social security number of a *relative who shared his first and last name* ("Family Member 2").  The information submitted by KENNEDY was transmitted to the third-party tenant screening service, whose servers are located out of state.

48. The Landlord and the Landlord's spouse received an email sent to XXXXXXXXXXX@gmail.com on or about November 2, 2022, notifying them that the tenant screening report for KENNEDY was available.  The report identified the applicant as "Robert Kennedy" and "Robert [**] Kennedy."  (The Landlord did not notice that the middle initial in the tenant screening report was different from the middle initial listed on KENNEDY's paystubs.)  The credit report was well-rated with no collections reported, no past due balances, and a history of on-time payments.  There were no evictions reported by the tenant screening service.

49. The Landlord did not know that the tenant screening report showed the credit history and eviction history for Family Member 2, not KENNEDY. Relying on the information from the tenant screening report, the Landlord approved KENNEDY's application and offered KENNEDY and the Girlfriend a lease for the Chestnut Street Apartment with a move-in date of November 13, 2022.

50. KENNEDY met the Landlord on or about November 11, 2022 to sign the lease and exchange keys for the Chestnut Street Apartment. KENNEDY took possession of the Chestnut Street Apartment and began moving his possessions into the unit on or about November 11, 2022.

51. After he moved into the Chestnut Street Apartment, KENNEDY immediately began defrauding the Landlord by intentionally giving them bad checks and withholding rent payments. KENNEDY provided the Landlord two checks, one for $5,100 (the last month's rent and security deposit) and one for $1,275 (the first month's pro-rated rent) when he signed the lease for the Chestnut Street Apartment on or about November 11, 2022. Both checks were post-dated November 13, 2022, and the $1,275 check was not signed. KENNEDY met the Landlord's spouse and signed the $1,275 check a few days later. When the Landlord deposited the checks both checks bounced due to insufficient funds.

52. KENNEDY wrote the checks from a Salem Five bank account that he shared with the Girlfriend. The Salem Five account did not receive direct deposits of KENNEDY's paychecks and usually held very little money. The highest daily balance for the Salem Five account in the preceding three months was approximately $1,100. Money deposited into the Salem Five account was typically used within a few days of the deposit. When KENNEDY provided the Landlord $6,375 in checks on November 11, 2022, the Salem Five account

contained only $8.04. On November 13, 2022, the date of KENNEDY's checks to the Landlord, the Salem Five account balance was $256.16.

53. In contrast, KENNEDY maintained a separate account at Northern Bank where his Stoneham Police Department paychecks were automatically deposited weekly. KENNEDY's Northern Bank account received approximately $14,712 in deposits between October 20, 2021, and November 20, 2021. During that same period, KENNEDY made approximately $7,500 in cash withdrawals, Venmo payments, and account transfers from his Northern Bank account.

54. KENNEDY did not pay the rent or security deposit after the Landlord told KENNEDY that the checks for his initial $6,375 payment had bounced. Nor did KENNEDY make any additional rent payments even though he kept possession of, and continued to live at, the Chestnut Street Apartment and continued receiving regular payments from the Stoneham Police Department until he retired on or about February 23, 2023. The only payment KENNEDY made to the Landlord was a payment for $2,300 on or about March 7, 2023, after the Landlord filed an eviction action in Housing Court. KENNEDY currently owes the Landlord approximately $14,000 in unpaid rent.

## CONCLUSION

55. Based on the above information, I respectfully submit that there is probable cause to believe that ROBERT A. KENNEDY committed violations of 18 U.S.C. § 1343 (wire fraud).

56. In the District of Massachusetts, KENNEDY devised a scheme and artifice to defraud, and for obtaining money and property, namely, (i) a lease agreement for the Chestnut Street Apartment and (ii) tens of thousands of dollars in unpaid rent payments.

57. The defendant did so by means of materially false and fraudulent pretenses, representations, and promises, for example, by (i) providing the identifying information for a family member sharing his first and last name in order to pass the Landlord's credit check and

16

eviction screening, (ii) omitting at least two previous evictions from the rental application for the Chestnut Avenue Apartment, (iii) writing checks for the security deposit and rent from an account with insufficient funds, and (iv) withholding rent payments while maintaining possession of the Chestnut Avenue Apartment for approximately four months, despite having the means to pay rent.

58. The defendant transmitted or caused to be transmitted by means of wire communications in interstate commerce writings for the purpose of executing the scheme to defraud, namely the defendant transmitted the date of birth, social security number, and identity verification information of a family member sharing his first and last name to a third-party tenant screening service on or about November 2, 2022.

Respectfully submitted,

*Kristen Feldmann*
KRISTEN FELDMANN
Special Agent
Federal Bureau of Investigations

Subscribed to and sworn via telephone
in accordance with Fed. R. Crim. P. 4.1
on this 30 day of March, 2023.

DONALD L. CABELL
United States Magistrate Judge

